# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **ROBERT KEY #00423647,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 3:17-cv-00920 |
| | ) CHIEF JUDGE CRENSHAW |
| **DR. NWOZO, et al.,** | ) |
| | ) |
| Defendants | ) |

## MEMORANDUM

Robert Key filed a pro se complaint for alleged violation of his civil rights pursuant to 42 U.S.C. § 1983. (Doc. No. 1.) The complaint is before the Court for an initial review pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §§ 1915(e)(2) and 1915A, and 42 U.S.C. § 1997e.

## I. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1915(e)(2) and 1915A, the Court is required to conduct an initial review of any complaint filed in forma pauperis or filed by a prisoner seeking redress from a governmental entity or officer, and to dismiss the complaint if it is facially frivolous or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief. In reviewing the complaint to determine whether it states a plausible claim, "a district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009) (citing Gunasekera v. Irwin, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). A pro se pleading must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94

(2007) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). However, "a court cannot create a claim which [a plaintiff] has not spelled out in his pleading." Brown v. Matauszak, 415 F. App'x 608, 613 (6th Cir. Jan. 31, 2011).

Plaintiff sues under 42 U.S.C. § 1983 to vindicate alleged violations of his federal constitutional rights. Section 1983 confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that "the deprivation was caused by a person acting under color of state law." Tahfs v. Proctor, 316 F. 3d 584, 590 (6th Cir. 2003) (citations omitted); 42 U.S.C. § 1983.

## II. FACTUAL ALLEGATIONS

In accordance with the standard set forth above, the Court presumes that the following alleged facts are true for the purpose of its initial review. Plaintiff alleges that on the evening of June 26, 2016, while he was housed at the DeBerry Special Needs Facility in Nashville, he injured his left clavicle/shoulder while exercising. (Doc. No. 1 at 5.) A nurse examined his injury, which involved a "severe protrusion" from his left shoulder "along with major bruising/discoloring, & swelling," but told him that because of the late hour and the fact that it was the weekend, there was no doctor on duty, and that he would have to "rough the injury out" through the weekend and see a doctor on Monday. (Id. at 11.) Plaintiff was in severe pain and frustrated about not being provided with any treatment, including Tylenol or an ice pack, and got into an altercation during which he acknowledges he threatened some correctional officers. (Id.) Prison staff extracted

Plaintiff from his cell, pepper sprayed him, falsely accused him of threatening suicide, and placed him naked in a concrete cell with no mattress for the rest of the weekend. (Id.)

Three days later, Plaintiff saw Defendant Seahorn, a nurse practitioner, who gave Plaintiff a Tylenol and ordered an X-ray. (Doc. No. 1 at 5.) The X-ray was reviewed that day by Defendant Seahorn and the prison doctor, Defendant Nwozo, and confirmed that Plaintiff's left clavicle was broken and a plate in his left shoulder from a previous surgical repair was in two pieces, with pieces displaced and separated by almost an inch and protruding from his shoulder. (Id.) Defendant Nwozo ordered a consultation with a specialist. (Id.) During the two weeks Plaintiff waited to see the specialist, Defendants Nwozo and Seahorn did not provide Plaintiff with a sling or any other treatment except for Tylenol. (Id. at 6.)

Two weeks after the X-ray at DeBerry, Plaintiff was taken to see an orthopedic specialist, Dr. Ronald Baker. Dr. Baker took new X-rays that confirmed the severity of Plaintiff's broken bone(s), which Dr. Baker said could not heal without surgery. Dr. Baker said that surgery should be scheduled urgently, and that in the meantime Plaintiff should have his arm immobilized in a sling and receive Lortab for pain. (Doc. No. 1 at 6.) Defendants Nwozo and Seahorn refused to provide the sling or the Lortab, and repeatedly refused to see Plaintiff at all, ignoring his many sick call referrals (more than a dozen) and the entreaties of other prison staff who were aware of Plaintiff's condition and the severe pain he was in. (Id. at 6–7.) Plaintiff began to experience nerve problems in his left arm, hand and fingers, and continued to have severe pain for which he received only Tylenol. (Id. at 6.) On several occasions, Defendant Nwozo and/or Defendant Seahorn were in Plaintiff's housing pod, at a nurse station 50 feet from his cell, but ignored officers' requests that they see Plaintiff. They could clearly hear Plaintiff begging through his cell door for them to see him, but would simply walk out of the pod. (Id. at 7.)

3

At some point, Plaintiff was taken to the hospital for surgery, but the surgery was canceled due to an equipment breakdown, and prison officials were told to reschedule the surgery for the following week. (Doc. No. 1 at 9, 10, 13.) Some months after his injury, Plaintiff finally saw Defendant Seahorn again. (Id. at 7.) Seahorn told Plaintiff that, despite what Dr. Baker had said, Seahorn and Nwozo did not believe Plaintiff's condition warranted a sling or any pain medication stronger than Tylenol. He refused to refer Plaintiff to a physician, told Plaintiff that Defendant Nwozo did not want to and would not see him, and warned him to stop signing up on sick call and requesting to see a doctor or his surgery "would be postponed even longer than it already had." (Id.)

Weeks later, Plaintiff was able to get the attention of Warden Holloway as he was passing through the pod during cell inspection. (Doc. No. 1 at 7–8.) Plaintiff discussed his situation with the warden, who told Plaintiff to behave and not cause any problems, and that he would "look into the matter & speak to someone about having Dr. Nwozo to see [him] that day." (Id. at 8.) Neither Nwozo nor Seahorn came to see Plaintiff despite his continual sick calls and requests from the nurses and officers who saw him on a daily basis. Two weeks later, during another cell inspection, Plaintiff spoke again to Warden Holloway, who was frustrated to hear that his request for Dr. Nwozo to see Plaintiff had not been honored. During that conversation, a corrections sergeant and corporal who were with the warden confirmed that Nwozo and Seahorn had continuously refused to see or treat Plaintiff and two other inmates for months. The warden used his cell phone to call Dr. Nwozo's supervisor and demanded that Dr. Nwozo come see Plaintiff immediately. (Id.) Plaintiff was taken that day to an exam room to see Dr. Nwozo, who still refused to examine Plaintiff:

> He stated he is not required to see or speak to me unless [it] is a[n] emergency & that my injury is not. I explained to him about the nerve problems that started

4

several months before. He stated that they will go away – that is very common with
my injury & that is nothing out of ordinary – that I do not need medicine or to see
a specialist & that he would not discuss it anymore. Even after I showed him my
hand/fingers & explained how it has gradually worsened since last few months –
he stated he would not discuss it any further. I told the Dr. I [was] in extreme pain
(constantly) – that I also have severe nerve shocks in arm/neck & severe nerve pain
– also that bone is continuously moving around inside of body – despite the care I
take to move slow & that I have been in severe pain since injury. I asked why he
ignored Dr. Baker's recommendations for Lortab for pain . . . . He stated to me that
he overrides Dr. Baker & that Tylenol is sufficient & further went on to falsely
claim that I injured myself & that I should just deal with the pain. . . . I then begged
him for pain medicine. He told me he [was] going to give me Lortab #5 even tho
he thinks I deserve to be in pain for supposedly injuring myself. He told me not to
bother him again. I asked about my surgery. He told me it is approved but not
rescheduled. . . that I do not need to worry about it, that they will give surgery
whenever they feel inclined to do so. Dr. Nwozo also told me that surgery depends
upon my behavior. That if I have any altercations with staff again that I will not get
my surgery.

(Id. at 9–10.) Plaintiff began receiving the Lortab, but it was not effective at eliminating his pain, which continued to increase with worsening nerve problems and protrusion in his shoulder, and several more weeks passed in which Plaintiff's sick call requests were ignored by Nwozo and Seahorn. (Id. at 10.)

On October 31, 2016, Plaintiff filed a grievance about his medical care. (Doc. No. 1 at 10.) The medical department's response to his grievance falsely stated that Plaintiff was injured while resisting officers during his cell extraction, and that Dr. Baker had not determined whether or when Plaintiff needed surgery. (Id.) He appealed the denial of his grievance but obtained no relief. (Id. at 12.) On November 29, 2016, in increasing pain and still being ignored by Nwozo and Seahorn, Plaintiff filed a second grievance, but the respondent again claimed that Dr. Baker had not ordered surgery, and Plaintiff was again denied relief. (Id. at 13.) Plaintiff appealed to the warden and the deputy commissioner of operations. (Id.)

In January 2017, Plaintiff was visited by Dr. Wiley, the medical director of the Tennessee Department of Correction. (Doc. No. 1 at 14.) Defendant Wiley told Plaintiff that he had reviewed

5

his medical file prior to the visit and that he would personally be overseeing his care going forward. Wiley acknowledged that Dr. Baker had indeed ordered surgery, and that Nwozo and Seahorn's treatment of Plaintiff and refusal to comply with Dr. Baker's recommendations had been wrong. (Id.) Wiley said that he did not understand why Plaintiff's surgery had not been rescheduled, but that he would personally have it rescheduled immediately. (Id. at 15.) He also cautioned Plaintiff to "behave b/c altercations with the staff could further injure [his] shoulder & that it gives the prison & certain unnamed people reasons to deny [his] surgery." (Id.)

Defendant Wiley visited Plaintiff again a week later. (Doc. No. 1 at 15.) Wiley said that he had asked Dr. Nwozo to give Plaintiff stronger pain medication and some nerve medication, but could see from Plaintiff's chart that Nwozo had not complied. Wiley said that he would speak directly to Nwozo about it immediately after the meeting with Plaintiff. Defendant Wiley also asked Plaintiff to undergo a mental health evaluation, because he said that Defendants Nwozo and Seahorn had alleged that Plaintiff was mentally unstable and possibly suffering from paranoid schizophrenia. (Id.) Plaintiff agreed to the evaluation and says that he was "cleared by mental health," the evaluation's having revealed no mental health problems other than "anti-social issues." (Id.) Plaintiff began receiving Gabapentin and an increased dosage of Lortab, but never saw or heard from Defendant Wiley again. (Id. at 16.)

In late January 2017, Plaintiff was visited by Dr. Nwozo's supervisor, Dr. Chester, who assured him that surgery to repair his shoulder would be scheduled soon. (Doc. No. 1 at 16.) But on February 1, 2017, without any further word from Dr. Chester, Plaintiff was informed that he was not having surgery, that he was "cleared medical status," and he was handcuffed, shackled, put on a bus and transferred from DeBerry to RMSI. (Id.) RMSI nurses who examined Plaintiff on his arrival there were "perplexed and appalled" that DeBerry had cleared his medical status and

6

transferred him in his condition. (Id. at 17.) A few days later, Dr. Sidberry at RMSI had Plaintiff's shoulder X-rayed and confirmed that his clavicle was "severely broken and displaced." Comparison of that X-ray to the July 2016 X-rays showed that the injury had worsened significantly over time, and that the screws and separated pieces of plate in his shoulder had changed position and were causing additional damage. (Id.) Dr. Sidberry ordered an urgent consult with a specialist, and also ordered pain medication and an extra pillow and bedding to keep Plaintiff's shoulder comfortable. (Id.)

Less than two weeks later, Plaintiff was taken back to see Dr. Baker. (Doc. No. 1 at 18.) Dr. Baker confirmed that he had not only ordered surgery in July 2016, but that he had indicated it was urgent and should be expedited. He said that the prison had later decided not to authorize the surgery. (Id.) He also confirmed that he had ordered a sling and pain medication in July 2016, and that any doctor knows that Tylenol would not be sufficient to address the pain of his injury. (Id. at 19.) Dr. Baker said that he was again ordering surgery and flagging it as urgent. He cautioned Plaintiff to behave and not have any physical altercations with corrections officers or do any upper body exercises for five to six months after surgery to let his shoulder heal. (Id.) New X-rays that day confirmed that prolonged lack of treatment had caused Plaintiff's injury to grow much worse as compared to the July 2016 X-rays. (Id. at 20.)

Plaintiff underwent surgery to repair his broken clavicle and plate on April 18, 2017. (Doc. No. 1 at 26.) Dr. Baker informed him that the surgery was much more complicated and required more extensive repair as a result of the long delay. (Id.) Plaintiff alleges that within days of the surgery he could feel that something was wrong in his shoulder. He was in extreme pain and could feel something out of place in his shoulder. (Id.) At his two-week post-surgical follow-up appointment, Dr. Baker diagnosed Plaintiff with an infection in his shoulder, and X-rays confirmed

7

the shoulder was not healing properly. (Id. at 27.) Plaintiff alleges that he has not received adequate medical care at RMSI since his surgery, but also blames the poor outcome on complications attributable to the ten-month delay in getting surgery. (Id.)

Plaintiff claims that Defendants Nwozo, Seahorn and Wiley have each been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. He seeks monetary damages totaling $300,000, as well as a declaratory judgment and an injunction requiring Defendants to provide him with another surgery and rehabilitation to repair his shoulder.

### III. ANALYSIS

Deliberate indifference to a prisoner's serious medical needs "constitutes the unnecessary and wanton infliction of pain" and violates the Eighth Amendment. Ruiz v. Martin, 72 F. App'x 271, 275 (6th Cir. 2003) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Villegas v. Metro. Gov't of Nashville, 709 F.3d 563, 570 (6th Cir. 2013). The "deliberate indifference" necessary to violate the constitution is a higher standard than negligence and requires that the official know of and disregard an excessive risk to the inmate. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Mere allegations of medical malpractice or negligent diagnosis and treatment do not state an Eighth Amendment claim for cruel and unusual punishment. See Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976). To prevail under those

circumstances, an inmate must establish that the treatment he received was "so woefully inadequate as to amount to no treatment at all." Ruiz, 72 F. App'x at 276 (quoting Westlake, 537 F.2d at 860 n.5).

It is generally undisputed that a broken clavicle is a serious medical need. Scott v. Morgan, No. 4:14-CV-01853-JAR, 2016 WL 3971394, at *4 (E.D. Mo. July 25, 2016) ("There is no real dispute that Scott's broken clavicle was a serious medical need."); Hightower v. City of St. Louis, No. 4:14-cv-1959, 2015 WL 3891821, at *2 (E.D. Mo. 2015) (shoulder fractured in two places constituted objectively serious medical need); Matthews v. Lahey, No. 2:09-CV-2415 GEB KJN, 2012 WL 5289318, at *6 (E.D. Cal. Oct. 23, 2012), report and recommendation adopted, No. 2:09-CV-2415 GEB KJN, 2012 WL 6642862 (E.D. Cal. Dec. 20, 2012) ("The parties do not appear to dispute that a broken clavicle demonstrates a serious medical need."). According to the complaint, Defendants Nwozo and Seahorn knew within three days of his injury that his clavicle was broken.

In light of that awareness of a serious medical need, Plaintiff's allegations about his treatment by Defendants amount to more than mere negligence. The alleged facts suggest that Defendants' opinions about Plaintiffs' behavior and the cause of his injury influenced them to withhold treatment they knew to be necessary. Plaintiff alleges that Defendant Nwozo expressly stated that Plaintiff deserved to be in pain, and that each of the Defendants at one time or another indicated that annoyance or disapproval of Plaintiff's behavior was a factor in delaying surgery. In the meantime, their minimal contact with him, despite pleas from Plaintiff, other prison staff and even the warden, and their prolonged failure to provide the surgery or other treatments Dr. Baker ordered further evidence a deliberate indifference to his condition. Delaying "urgent" surgery for ten months, and providing nothing more than Tylenol to treat a broken clavicle for much of that time, is arguably "so woefully inadequate as to amount to no treatment at all." Ruiz,

72 F. App'x at 276 (quoting Westlake, 537 F.2d at 860 n.5). Although Defendant Wiley did not become personally involved in Plaintiff's care until January, and did order new medication at that time, he still failed to schedule the surgery that he acknowledged was necessary, and was presumably involved in Plaintiff's being medically "cleared" and transferred to RMSI without surgery or orders for further treatment. Taking Plaintiff's allegations as true, as the Court must at this stage of the case, the Court finds that Plaintiff has stated a claim against the Defendants for deliberate indifference.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff states non-frivolous claims for deliberate indifference against the Defendants, and process shall issue on Plaintiff's claims.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE